# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59886-8-II |
| Respondent, | |
| v. | |
| RICHARD ROY PERRY, JR., | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — In 2021, Community Corrections Officers (CCO) found three firearms in two different vehicles owned by Richard R. Perry, Jr.  The State charged Perry with three counts of first degree unlawful possession of a firearm.  A jury found Perry guilty as charged, and the trial court imposed an exceptional sentence under RCW 9.94A.535(2)(c), the free crimes aggravator.

Perry appeals, arguing that (1) insufficient evidence supports his convictions for three counts of first degree unlawful possession of a firearm, (2) the trial court erroneously allowed for the admission of testimonial hearsay, and (3) because of the Unites States Supreme Court's recent opinion in *Erlinger v. United States*,[1] the trial court violated his constitutional rights by imposing an exceptional sentence without a jury finding.  We affirm.

---

[1] 602 U.S. 821, 144 S. Ct. 1840, 219 L. Ed. 2d 451 (2024).

FACTS

I. BACKGROUND

In 2021, the Department of Corrections (DOC) was monitoring Perry for compliance with community custody conditions imposed as a result of past criminal convictions. On June 16, 2021, based on information that Perry had possession of firearms in violation of these conditions, the CCOs searched Perry's house in Winlock. The CCOs found two firearms in Perry's black Durango SUV at his Winlock home: a .38 caliber Colt revolver (.38 revolver) and a 5.56 caliber Diamondback assault rifle (assault rifle). The CCOs also found a third firearm in the red Raptor pickup that Perry had driven to the DOC offices: a .40 caliber Smith & Wesson semiautomatic pistol (.40 semiautomatic). The State charged Perry with three counts of unlawful possession of a firearm: count 1 for the .40 semiautomatic, count 2 for the .38 revolver, and count 3 for the assault rifle.

II. TRIAL

At Perry's jury trial, CCO Christina Evens,[2] CCO Tyson Cooper, CCO Jeff Gunsolley, and Corrections Specialist (CS) Debora Byers testified for the State. Perry's friend Jessica Nanney testified for the defense.

A. CCO EVENS TESTIMONY

CCO Evens testified that she was supervising Perry while he was on community custody. CCO Evens was responsible for ensuring that Perry followed his community custody conditions,

---

[2] CCO Evens later changed her last name to "Moody" after leaving the DOC, but because the record largely refers to her as "Evens," for clarity and consistency, we will defer to that name for this opinion.

including conditions prohibiting him from possessing any firearms or related contraband. On May 14, 2021, CCO Evens and her field partner, CCO Cooper, conducted a home visit at Perry's Winlock home. At that time, Perry lived in the home with Jaimie Nieves—his wife,[3] Carlos Nieves[4]—Jaimie's son, and Jacob Huble[5]—another person on DOC supervision. Perry was also operating a mechanic business in a shop on the property.

As the CCOs were ending the home visit, CCO Evens saw a shell casing in the driveway. CCO Cooper testified that the shell casing was for a .223 rifle and likely had been fired from an AR-15. CCO Evens explained that the shell casing made her concerned that there may be firearms on the property.

CCO Evens testified that when a person on supervision potentially possesses firearms, CCOs use a team to safely conduct a search. So CCO Evens contacted CCO Gunsolley to plan and execute the search of Perry's Winlock home. The two agreed that CCO Gunsolley would take lead on the day of the search and that CCO Evens' primary role would be to detain Perry during his upcoming check-in appointment at the DOC office.

On June 16, 2021, Perry arrived at the DOC office in a Raptor pickup. While CCO Evens met with Perry, CS Byers watched Perry's pickup in the parking lot. CCO Evens testified that she

---

[3] In his opening brief, Perry said that the record "incorrectly" referred to Nieves as Perry's wife. Opening Br. at 13. But during his statement to the trial court at sentencing, Perry referred to Nieves as "[his] wife." Verbatim Rep. of Proc. at 358. Based on Perry's statement, we refer to Nieves as Perry's wife.

[4] Because Carlos and his mother Jamie share a last name, we refer to Carlos by his first name. We intend no disrespect.

[5] The State indicates that Huble's name is spelled incorrectly in the record. Nevertheless, we use the spelling of Huble as transcribed at trial for clarity.

3

told Perry that CCOs would be conducting a search of his Winlock home and then she transported Perry there.

B.  CCO GUNSOLLEY TESTIMONY

CCO Gunsolley testified that he coordinated the search of Perry's Winlock home with CCOs Evens and Cooper.  When CCO Gunsolley and his team arrived at Perry's property, Carlos was in the process of leaving the property in Perry's Durango SUV.  CCO Gunsolley had Carlos step out of the SUV so that the CCOs could search it.  CCOs found a .38 caliber Colt revolver, an unloaded 5.56 caliber Diamondback assault rifle with at least one loaded magazine, gun safes with multiple rounds of .38 and .40 caliber ammunition, .223 caliber rifle ammunition, multiple .40 caliber and additional assault-rifle magazines, several other gun parts and scopes, and multiple police scanners.

Then the CCOs searched the house and Perry's shop.  In the house, CCO Gunsolley testified that he and his team found two hidden compartments, one inside a shelf in the living room and one inside a shelf in Perry's bedroom.  The concealment shelf in the living room fit two firearms and three magazines.  The cutouts within the concealment shelf in the living room matched a .38 revolver (found in the SUV) and a .40 semiautomatic (later found in the pickup). The cutout inside the concealment shelf in Perry's bedroom matched the assault rifle (found in the SUV).  In Perry's shop, the CCOs found tactical gear and a box of firearm-related items, including holsters, gun lights, ammunition, and magazines.  The CCOs also found a Samsung Pay SoFi bank card with the name "Rick Perry" on it in the box of firearm-related items.

CCO Gunsolley testified that he then returned to the DOC office to assist in the search of Perry's pickup.  In the pickup, the CCOs found a .40 semiautomatic.

4

CCO Gunsolley admitted that they did not find any guns inside the house or the shop, but he explained that each of the guns they had found in Perry's SUV and Perry's pickup fit into the concealment shelves in Perry's home.

## C. CCO COOPER TESTIMONY

CCO Cooper testified that prior to the search of Perry's home, he had received "additional information" from another person that had prompted the CCOs to look for firearms.[6] Verbatim Rep. of Proc. (VRP) at 139. CCO Cooper identified the other person as Huble, the former resident at the Winlock home who was also on DOC supervision. CCO Cooper shared this information with CCO Gunsolley. Perry did not object to this initial testimony.

Later during his testimony, CCO Cooper made two additional references to the information he received from Huble. First, CCO Cooper noted that the information was used to instruct the search team on where to look:

> [The State:] . . . [A]nd based on information that you received, did you instruct the response team specifically where to look on the property?
> [CCO Cooper:] I did.

VRP at 140-41. Perry objected, but his objection was overruled.

Second, during cross-examination, CCO Cooper referenced the information again when he was asked about where he was searching in Perry's bedroom:

---

[6] Based on the incident report written by CCO Gunsolley, this "additional information" was that Huble told CCO Cooper that Huble and Perry had a falling out and that he was no longer living at Perry's house in Winlock. Huble "indicated that Perry ha[d] guns hidden on his property and that his guns were in camouflaged gun safes in the house . . . ." Clerk's Papers at 100. This detail was never presented to the jury.

[Perry:] Okay. Were these [concealment shelves]—when you walked into—when you walked into the bedroom, the [shelf] in the bedroom was definitely still attached to the wall; correct?

[CCO Cooper]: Yes, sir.

. . . .

[Perry:] Was it obvious? I mean, did you see it when you first walked in the room?

[CCO Cooper:] With the information that I had been given, yes, I knew right where to look.

VRP at 156. Perry did not object to this response or move to strike it.

D. CS BYERS TESTIMONY

CS Byers testified that she watched Perry's pickup in the parking lot while Perry was meeting with CCO Evens. She testified that no one working at the DOC office saw Perry arrive with anyone else in the pickup and that she personally did not see anyone in or near the pickup while it was in the parking lot. CS Byers testified that when her team arrived and opened the doors to the pickup, she immediately saw the butt of a gun on the floor under one of the front seats. The CCOs later identified this gun as a .40 caliber semiautomatic.

E. NANNEY TESTIMONY

After the State rested, Nanney testified for the defense. She was friends with both Perry and his wife, Nieves. Nanney testified that she owned all three firearms and that, without Perry's knowledge, she had given them to Nieves. Nanney explained that she was the person who had purchased the firearms, the concealment shelves, and the other firearm-related items. Nanney testified that, two weeks before the search, she asked Nieves to hide the guns. She claimed that she needed the guns out of her house because she was afraid of Huble, her ex-boyfriend, who was "crazy and psychotic" and had been stalking her. VRP at 253.

6

Nanney also testified that she was responsible for the gun found in Perry's pickup. She testified that the night before Perry's check-in appointment at the DOC office, she spent the night at Perry's house. The next morning, she took her .38 revolver back from Nieves, and then, with the revolver, she left with Perry in the pickup. Nanney testified that when the two arrived at the DOC office, she waited in the pickup for about 20 minutes, before deciding she needed to leave. When she got out of the pickup, however, she left her revolver in the pickup. In her testimony, Nanney insisted it was a .38 caliber revolver, and not a .40 caliber semiautomatic, that she left in Perry's pickup.

F. Jury Verdict

After deliberations, the jury found Perry guilty as charged for all three counts of first degree unlawful possession of a firearm.

III. Sentencing

At sentencing, the State calculated Perry's offender score as 12. The State argued that because this high offender score would result in some of Perry's offenses going unpunished, an exceptional sentence was warranted under the free crimes aggravator.

The trial court first determined that counts 2 and 3 were the same criminal conduct because those counts related to the two firearms found in the SUV—the same place, at the same time. However, the trial court found that count 1, relating to the firearm found in the pickup in the DOC parking lot, was separate criminal conduct.

The trial court then agreed with the State that an exceptional sentence was warranted under the free crimes aggravator, RCW 9.94A.535(2)(c). It ordered that the sentence for count 1 run consecutively with the concurrent sentences for counts 2 and 3 and imposed a total of 217 months'

confinement. The trial court issued written findings supporting the exceptional sentence, which stated, "The Court finds 9.94A.535(2)(c) as follows: The defendant has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished." Clerk's Papers (CP) at 284 (boldface omitted).

Perry appeals.

## ANALYSIS

Perry argues that (1) insufficient evidence supports his convictions for unlawful possession of each of the firearms at issue, (2) the trial court erred by admitting testimonial hearsay and its admission was not harmless, and (3) the United States Supreme Court's recent opinion in *Erlinger* requires a jury finding before the trial court may impose an exceptional sentence under the free crimes aggravator. We affirm.

## I. SUFFICIENCY OF THE EVIDENCE

Perry challenges the sufficiency of the evidence for all three of his convictions for unlawful possession of a firearm. Perry argues that the State failed to prove beyond a reasonable doubt that Perry *possessed* each of the firearms, claiming that "at most" the State presented evidence of Perry's proximity to the firearms at issue. Opening Br. at 29.

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). A sufficiency of the evidence claim admits the truth of the State's evidence and draws all reasonable inferences from that evidence "in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). On review, we determine whether any rational finder of fact could find that all the elements of the charged crime were proven beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d

222, 231, 572 P.3d 1191 (2025). Circumstantial and direct evidence are considered equally reliable, and credibility determinations are not subject to review. *State v. Zghair*, 4 Wn.3d 610, 620, 567 P.3d 1 (2025).

To convict Perry of first degree unlawful possession of a firearm, the State had to prove beyond a reasonable doubt that Perry knowingly possessed a firearm after having been convicted of a serious offense. RCW 9.41.040(1)(a). As it applies to this case, "knowingly," means that a person has "information which would lead a reasonable person in the same situation to believe" that they were in possession of firearms. RCW 9A.08.010(b)(ii).

Possession, under the statute, may be actual or constructive. *State v. Chouinard*, 169 Wn. App. 895, 899, 282 P.3d 117 (2012), *review denied*, 176 Wn.2d 1003 (2013). Constructive possession occurs when a person has dominion and control over an item. *State v. Reichert*, 158 Wn. App. 374, 390, 242 P.3d 44 (2010), *review denied*, 171 Wn.2d 1006 (2011). Appellate courts consider the totality of the circumstances when determining whether a person has dominion and control, including dominion and control over the premises where the item was located, and the ability to exclude others from use of the item. *See State v. Ibarra-Erives,* 23 Wn. App. 2d 596, 602, 516 P.3d 1246 (2022), *review denied*, 200 Wn.2d 1028 (2023) (determining constructive possession based on dominion and control where the item was located); *see also State v. Edwards*, 9 Wn. App. 688, 690, 514 P.2d 192 (1973) (determining dominion and control based on ability to exclude others from use of the item). No single factor is dispositive. *State v. Turner*, 103 Wn. App. 515, 521, 13 P.3d 234 (2000). And dominion and control need not be exclusive; more than one person can be in possession of the same item. *State v. George*, 146 Wn. App. 906, 920, 193 P.3d 693 (2008).

Here, Perry argues that there was insufficient evidence to support the jury's verdicts because the State failed to present any direct evidence establishing that he knew about the firearms or that he constructively possessed them. Starting with the firearms found in the SUV, Perry argues that there was not sufficient evidence to show he possessed these firearms because Carlos was the one driving the SUV at the time the guns were found.

We are unpersuaded. First, Carlos' driving the car is not dispositive because more than one person may be in possession of an item. *See George*, 146 Wn. App. at 920. Furthermore, there was far more evidence supporting Perry's knowing possession of these firearms than his argument would suggest. Perry was the owner of the SUV, demonstrating Perry's dominion and control over the premises where the guns were found. *See Ibarra-Erives*, 23 Wn. App. 2d at 602. There was also firearm-related paraphernalia found in the SUV, including gun safes and a variety of ammunition. Some of the ammunition matched, not just the guns in the SUV, but also the .40 semiautomatic handgun found in Perry's pickup. And these gun safes were consistent with the other paraphernalia that was found in Perry's shop.

Although it is true that Perry was not in proximity to the SUV at the *precise* time the firearms were found, that fact alone does not mean Perry did not constructively possess them. Perry could have readily exercised dominion and control over the contents of the SUV when he was at the Winlock property by assuming possession of his own vehicle or accessing its contents. Further, the sheer amount of firearm-related items in the SUV, particularly the gun safes, supports a reasonable inference that Perry would be aware of the items inside of the vehicle registered to him on his property. A reasonable juror could have inferred that Perry had constructive possession of the items in the SUV even though he happened to be at his DOC appointment when the firearms

were found. *See Turner*, 103 Wn. App. at 521 (lack of proximity to the item is not dispositive of possession). Under the totality of the circumstances and construing all of the evidence, and its inferences, in the light most favorable to the State, a reasonable juror could find that Perry knowingly had constructive possession of the .38 revolver and the assault rifle found in the SUV. Thus, sufficient evidence supports Perry's convictions for first degree unlawful possession of a firearm related to the .38 revolver and the assault rifle.

The same conclusion holds for the .40 semiautomatic found in the pickup. The State presented evidence that Perry was the registered owner of the pickup where the .40 caliber semiautomatic was found and that he drove the pickup to the DOC office. *See id.* at 524 ("Ownership and actual control of a vehicle establish dominion and control."). Moreover, based on the circumstances, it was reasonable for the jury to infer that Perry drove the pickup with the .40 semiautomatic inside, and then left the firearm when he went into the DOC office. Further, Perry could have easily taken *actual* possession of the .40 caliber semiautomatic, if he had returned to the pickup. Thus, the State presented sufficient evidence to prove that Perry had constructive possession of the .40 semiautomatic found in his pickup in the DOC parking lot.

Rejecting the inferences from these facts, Perry argues that Nanney's testimony proves that the .40 semiautomatic was not his and that he had no knowledge of it being in the pickup. Perry correctly points out that Nanney testified that her handgun was in the pickup and that Perry had neither knowledge of nor responsibility for it.[7] Clearly, however, the verdict shows that the jury

---

[7] We note that Nanney insisted that she left a .38 revolver, not a .40 semiautomatic, in the pickup, contrary to the CCO testimony that it was a .40 semiautomatic that was found in the pickup.

did not find Nanney's testimony credible, and we do not review credibility determinations. *See Zghair*, 4 Wn.3d at 620. With the credibility of Nanney's testimony rejected, the evidence is not devoid, as Perry argues, of any evidence showing his knowing possession of the .40 semiautomatic. Rather, under the totality of the circumstances, when we view the evidence and all reasonable inferences in favor of the State, there is sufficient evidence for Perry's conviction related to the .40 semiautomatic.

II. ADMISSION OF HEARSAY TESTIMONY

Perry next argues that the trial court violated the confrontation clause by admitting testimonial hearsay. Specifically, Perry identifies as testimonial hearsay CCO Cooper's references to the "additional information" that CCO Cooper testified assisted in focusing the search to specific locations in the Winlock house. Although the jury never heard the substance of the "additional information," they did hear it came from Huble, another resident of the Winlock house on DOC supervision. The State appears to concede, at least in part, that Cooper's testimony was inadmissible as testimonial hearsay. Assuming without deciding that CCO Cooper's testimony was inadmissible, any error was harmless.

The review of constitutional errors generally requires the application of the constitutional harmless error standard. *See State v. Jasper*, 174 Wn.2d 96, 117, 271 P.3d 876 (2012). This standard requires that "the [S]tate to prove that 'the untainted evidence is so overwhelming it necessarily leads to a finding of guilt.' " *State v. Magana-Arevalo*, __ Wn.3d __, 582 P.3d 330, 346 (2026) (quoting *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996)). Recently our Supreme Court clarified that when applying the constitutional harmless error standard to the admission of evidence, reviewing courts must consider "*both* the strength of the properly admitted

evidence of guilt as well as the prejudicial impact of the erroneously admitted evidence on even the properly admitted evidence." *Id.* at 345 (abrogating *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985); *State v. Anderson*, 171 Wn.2d 764, 254 P.3d 815 (2011); *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 327 P.3d 660 (2014)).

Here, the properly admitted evidence of guilt was strong. Looking with precision at the arguably improperly admitted evidence from Huble, it related only to the search of the house and, more specifically, to the locations of the firearm concealment shelves. Thus, because the firearms were all found in the SUV and pickup, the search related to actual discovery of the incriminating evidence was untainted by Huble's "additional information."[8]  Therefore, the properly admitted evidence includes the three firearms found in Perry's vehicles, as well as the evidence of all the additional firearm-related paraphernalia found in the SUV. The totality of the evidence related to the guns found in Perry's vehicles, especially with inferences from that evidence, constitutes overwhelming evidence of Perry's guilt for the charged crimes.

---

[8] In this context, we use the term "untainted" as used in *State v. Jasper* to refer evidence that was properly admitted and would not have been excluded based on the alleged constitutional error, rather than, as Perry seems to suggest, using tainted to mean "related to" or "flowing from" similar to its use in the exclusionary rule. *State v. Jasper*, 158 Wn. App. 518, 536, 245 P.3d 228 (2010), *aff'd*, 174 Wn.2d 96, 271 P.3d 876 (2012); Opening Br. at 38-39, 40-41. To the extent that Perry suggests the properly admitted evidence is "tainted" because the inadmissible evidence had an effect on the jury, that is addressed by our analysis of the prejudicial impact of the testimony.

In addition, any prejudicial impact of this aspect of CCO Cooper's testimony was minimal. CCO Cooper never identified the actual information that he received from Huble; he just suggested that the information assisted where the search in the house should be focused. Perhaps the most prejudicial inference that the jury could reach from this testimony is that Huble told CCO Cooper that Perry had firearms at his house in Winlock. However, this inference would be weak because of the specific way CCO Cooper referred to the additional information to the jury. Again, in his two references, CCO Cooper spoke only of the location of the concealment shelves found in the house, not to the firearms themselves. Given the strength of the evidence against Perry and the lack of specifics from Huble's information testified to by CCO Cooper, it is unlikely that the jury relied on a weak inference to convict him of three counts of unlawful possession. *See Magana-Arevalo*, 582 P.3d at 345.

The properly admitted evidence against Perry was strong and any prejudicial impact from CCO Cooper's reference to the "additional information" (from Huble) was minimal. Thus, assuming that the admission of CCO Cooper's testimony referencing Huble's information was error, it was harmless. *Id.* at 346.

III. EXCEPTIONAL SENTENCE

Perry argues that the trial court erred by imposing an exceptional sentence based on the free crimes aggravator, RCW 9.94A.535(2)(c), without a jury finding. Perry's argument is premised on the assertion that based on a recent decision from the United States Supreme Court in

*Erlinger*, a jury, not a judge, must make a finding on the free crimes aggravator before it may be used to impose an exceptional sentence. We disagree.[9]

It is well-established Washington law that imposing an exceptional sentence based on the free crimes aggravator without a jury finding does not violate the right to a jury trial. *See State v. Alvarado*, 164 Wn.2d 556, 563-69, 192 P.3d 345 (2008). *Erlinger* does not affect this; Washington courts have held that the holding in *Erlinger* is limited to the "different occasions" inquiry under the federal Armed Career Criminal Act and does not overrule existing Washington precedent. *State v. Frieday*, 33 Wn. App. 2d 719, 747, 565 P.3d 139, *review denied*, 5 Wn.3d 1006 (2025), *cert. denied*, __ S. Ct. __, 2026 WL 490556 (Mem) (Feb. 23, 2026); *State v. Anderson*, 31 Wn. App. 2d 668, 681, 552 P.3d 803, *review denied*, 3 Wn.3d 1034 (2024). Accordingly, Perry's argument, based on *Erlinger*, that his exceptional sentence is unconstitutional fails.[10]

---

[9] The State argues that Perry has waived his challenge to his exceptional sentence under RAP 2.5(a) because he cannot show that the error is manifest. Generally, we will refuse to review an error raised for the first time on appeal, although there is an exception for a manifest error affecting a constitutional right. RAP 2.5(a)(3). To be manifest, the asserted error must have had practical and identifiable consequences. *State v. Frieday*, 33 Wn. App. 2d 719, 743-44, 565 P.3d 139, *review denied*, 5 Wn.3d 1006 (2025); *cert. denied*, __ S. Ct. __, 2026 WL 490556 (Mem) (Feb. 23, 2026). Perry argues that the alleged sentencing error had practical and identifiable consequences because, absent the error, the trial court would have lacked statutory authority to impose an exceptional sentence. We agree and address the merits of Perry's sentencing argument.

[10] Perry also argues that the trial court's written findings of fact were insufficient because they did not identify every fact that the trial court relied on when determining the length of Perry's sentence and, therefore, did not comply with RCW 9.94A.535. RCW 9.94A.535 provides, "Whenever a sentence outside the standard range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law." Here, the trial court entered written findings of fact that cited RCW 9.94A.535(2)(c) as the reason for imposing a sentence outside the standard range. Perry did not object to the trial court's order below, and he makes no argument under RAP 2.5 for why review is now appropriate. Accordingly, we decline to address this argument for the first time on appeal. RAP 2.5(a).

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

CHE, J.